28 C.C.P.A. (Patents)

**PERKINS et al. v. ENGS et al.**

**Patent Appeal No. 4429.**

Court of Customs and Patent Appeals.
April 14, 1941.

W. J. Willis, of New York City (E. P. Boynton, of New York City, of counsel), for appellants.

A. B. Bakalar, of San Francisco, Cal., for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

JACKSON, Associate Judge.

This is an appeal in an interference proceeding wherein the Board of Appeals of the United States Patent Office affirmed a decision of the Examiner of Interferences awarding priority of invention of the subject matter in issue to appellees.

The interference involves a joint application of appellants, Serial No. 532,678, filed April 24, 1931, and appellees' patent No. 2,007,159 which issued July 9, 1935, on an application, Serial No. 541,526, filed June 1, 1931.

Appellees are the junior party and the burden was upon them to establish priority of invention by a preponderance of the evidence.

The subject matter of the interference, as set out by the Examiner of Interferences, is a process for making polymers of tertiary base olefines, "such as isobutylene, forming a part of the light hydrocarbon mixture produced by cracking of petroleum oils."

The counts read as follows:

"1. Process for making polymers of tertiary-base olefines contained in hydro-

carbon mixtures derived from the pyrolysis of mineral oil, which comprises treating said mixture in liquid phase with acqueous sulfuric acid under conditions of acid concentration and temperature adapted to absorb selectively the tertiary-base olefines in said mixture to form a tertiary alkyl sulfate liquor, separating the residue of said hydrocarbon mixture from the tertiary alkyl sulfate liquor, and thereafter treating said tertiary alkyl sulfate liquor to form polymers of the tertiary-base olefines.

"2. Process for making polymers of isobutylene from mixtures containing butanes, butenes and isobutylene derived from the pyrolysis of mineral oil, which comprises treating said mixtures in liquid phase with about 45% to about 65% sulfuric acid at a temperature below 35° -C. whereby substantially only isobutylene is absorbed to form a tertiary butyl sulfate liquor, separating the residue of said mixtures from the tertiary butyl sulfate liquor and thereafter treating said tertiary butyl sulfate liquor to form polymers of isobutylene including diisobutylene."

The counts are modified claims of appellees' patent.

Appellants, in their preliminary statement, allege conception of the invention, disclosure of it to others and reduction to practice during or about May, 1929. They also allege the exercise of reasonable diligence in adapting and perfecting the invention from the same date.

It is alleged in the preliminary statement of appellees that the invention was conceived and disclosed to others on or about October, 1929, reduced to practice on or about November, 1929, and that the exercise of reasonable diligence in "adapting the invention" began about October, 1929.

Appellants moved to amend the interference by adding thereto another claim of appellees' patent, and appellees moved to dissolve the interference on the ground that appellants had not made a sufficient disclosure to support the counts.

The Primary Examiner granted the motion to dissolve and denied the motion to amend. Upon appeal by appellants, the Board of Appeals reversed the decision as to the motion to dissolve and affirmed the decision as to the motion to amend.

Both parties took testimony.

Apparently the Shell Development Company, assignee of appellees' patent, and the Carbide and Carbon Chemicals Corporation, employer of appellants, are the real parties in interest.

The Examiner of Interferences, after analyzing in considerable detail the records of the parties, awarded to appellees the dates of November 18, 1929, and at least as early as December 1, 1929, respectively, for conception of the invention and its reduction to practice. He awarded sometime in the latter part of November, 1929, to appellants as the date for conception of the invention in issue. He could not fix a more definite date, he states, "because of the vague and unsatisfactory character of the evidence with respect to specific dates." He said that he could not accept appellants' evidence as establishing a reduction of the invention to practice prior to December 13, 1929. He then held that appellees were the first to conceive the invention and the first to reduce it to practice.

The Board of Appeals pointed out that appellants made no contention before it as to the conclusions of the examiner with respect to proof on the merits by appellees, but that appellants urged inter alia that they would have prevailed before the Examiner of Interferences if he had judged their testimony and proofs by the same concededly proper standards which he applied to that of appellees. The board, affirming the conclusions of the examiner, found that any alleged difference in the treatment of the records of the parties was "at most merely a matter of sufficiency of proof rather than difference in strickness of standard applied."

The questions involved in the appeal before us are stated in the brief of appellants as follows: "The sole issue raised by this appeal is that of priority of invention. This issue resolves itself into two inseparable questions. First, in the light of the evidence adduced by appellants, can an award of priority to the junior party—appellees be justified? And second, do the facts proven on behalf of appellants warrant award of priority to this senior party? To decide both of these questions, it is necessary to consider the effect of work done by one of two joint applicants for patent on the dates of invention as between those joint applicants (or one of them) and another party."

It appears that the appellant Perkins, during the spring of 1929, began investigating the broad problem of the "separation and utilization of hydrocarbons obtained by the cracking of petroleum," and that, according to his testimony, in the latter part of May and June, 1929, he treated a five-carbon fraction "with various strengths of sulfuric acid and alcohols and polymers were obtained." It is admitted that appellant Davies was not associated with Perkins until the fall of 1929 and that Davies did no work on the involved invention until October of that year, after which date the appellants cooperated in their research.

The Examiner of Interferences gave no consideration to any testimony with respect to the work said to have been done prior to October 1929, stating:

"Certainly if the work of Perkins in the Spring of 1929 were such that it satisfies the terms of the broad count 1, then the invention as defined therein can not possibly have been made jointly by Perkins and Davies but by Perkins alone. Count 2, however, differs from count 1 in material limitations, which are not found in any of Perkins' work prior to the entry of Davies, and accordingly it must be held that Perkins alone did not invent the subject matter of this specific count. No action has been taken by either Perkins or Davies or by their employer, Carbide and Carbon Chemicals Corporation and apparently the real party in interest, to present a sole application claiming the invention defined in either count, or to convert the involved Perkins and Davies application to a sole application. Nor has Davies, expressly or impliedly, formally or otherwise, disclaimed the subject matter of either count. There is nothing in the testimony of either Perkins or Davies which gives rise to an inference that the invention of this interference was made by the one or the other independently.

"Instead of attempting an explanation of the discrepancy between the dates set forth in the joint preliminary statement and the date at which the Carbide Company assigned the problem to Perkins and Davies jointly, it is sought to use this circumstance to the advantage of the Carbide Company herein without entailing the trouble and risks involved in substituting a sole application for the joint one here involved."

The board agreed with the reasoning of the examiner, and said in its decision:

"A moment's consideration of the nature of joint invention and joint applications as provided for by Rule 28, we believe, leads to the very elementary conclusion that true joint inventions must be treated as a unitary and inseparable entity coming into existence only by the joint efforts and at the time such joint action of the parties occurred. In respect to dates of the joint invention obviously no consideration can be given to prior activity of either party alone. We believe the principle leading to this conclusion is sufficiently illustrated by the discussion in Ex parte Benes, 1925 C.D. 75, Commissioner's decision. Reference to Rule 110 of the Rules of Practice as providing for 'each party' presenting preliminary statements and to the actions in interferences is not relevant since obviously the expression does not relate to each party of a joint application but to the party of each application considered as one legal entity even in case of joint applications.

"We find no error in the examiner's conclusions refusing to give benefit of any activity by Perkins alone prior to October, 1929 when Davies appeared and began joint activity."

Appellants in their brief vigorously contend there is basic error in the decisions of the tribunals below in that it was held that no benefit could be given appellants for work done by Perkins alone prior to October, 1929. In support of their contention they cite the cases of Briggs et al. v. Kaisling, 53 App.D.C. 49, 288 F. 254; Bijur v. Kennington, 51 App.D.C. 230, 278 F. 313; In re Roberts, 49 App. D.C. 250, 263 F. 646; Robin v. Muller and Bonnet, 110 O.G. 1429, 1904 C.D. 201; Ritter v. Krakau and Conner, 108 O.G. 1050, 1904 C.D. 44; and Kohler v. Kohler and Chambers, 43 O.G. 247, 1888 C.D. 19.

In the Briggs et al., case, supra [53 App. D.C. 49, 288 F. 257], we find the following: "When, therefore, it became apparent to the Patent Office that Briggs and not Briggs and Jacobi was the real inventor of this issue, either the joint application should have been amended or Briggs accorded the privilege of filing a sole application, *but he was denied either form of relief.* (Italics supplied)"

In the Bijur case, supra, the party Kennington filed a sole application for a pat-

ent urging that he was entitled to a certain prior date for reduction to practice because he and one McDermott had filed a joint application on that date for the invention there in issue. Prior to the date of filing the Kennington sole application the said joint application was held to be not allowable for the reason that Kennington was the sole inventor of the subject matter disclosed. The court held that Kennington was entitled to the date he claimed for constructive reduction to practice "on the theory that his application was an amendment of the joint one," and invoked the rule "that 'an amendment relates back to the time of the filing of the original petition.' Union Pacific R. Co. v. Wyler, 158 U.S. 285, 296, 15 S.Ct. 877, 882 (39 L.Ed. 983)." [51· App.D.C. 230, 278 F. 314.]

The facts in the case of In re Roberts, supra, are set out in the decision of the court as follows: "On June 24, 1912, the present applicant and Park D. Roberts, his son, filed an application embracing, not only subject-matter to which they jointly contributed, but, as well, the subject-matter involved in the present application. An interference was declared between this joint application and a reissue application of Mr. F. A. Bruckman, and during the taking of testimony it developed that the son had nothing to do with the particular subject-matter of the present application. Thereupon priority as to this subject-matter was awarded Bruckman by the Patent Office on the ground that the Roberts were not joint inventors. Just when the final decision was made does not appear, but it does appear that the present application was filed in October of 1917, as a continuation of the former joint application," and the question to be decided was whether in a case where the joint application had been filed through mistake or inadvertence and without fraudulent intent, the sole inventor, one of the joint applicants, is estopped from taking any advantage of that application. The court, in its decision, stated:

"No patent has been obtained under the former joint application, which the joint applicants concede was formally defective. To prevent a possible failure of justice, the present application should have been considered as a continuation of the abortive application. As already · suggested, we perceive no reason why the mistake could not have been rectified by a simple amendment, but in any event the sole inventor should not be deprived of his day in court by the raising of artificial barriers against him. He claimed his invention, and, through mistake, gave his son credit where no credit was due. The elimination of the son ought not to deprive the father, the sole inventor, of the benefit of his original application; and we so rule.

*"It perhaps is unnecessary to add that a party who seeks to correct his own mistake must act with reasonable diligence, and also assume the burden of establishing his good faith.* (Italics supplied)"

In the interest of brevity we will not discuss the decisions of the commissioner cited by appellants.

■ The facts in the instant case make the application of the decisions hereinbefore discussed impossible. Here appellants filed a joint application and a joint preliminary statement supported by a joint oath; they took testimony as joint inventors; they appealed to the Board of Appeals and here as joint appellants. If they made a mistake in filing a joint application nowhere do they appear to acknowledge or recognize it, although they could have saved any right alleged to be possessed by either of them under the rules set out in the very cases they cite in an attempt to support their insupportable contention. The question of joint invention might well have been raised by proper action on the part of appellants in this proceeding, as we stated we assumed without deciding could be done in the case of Brown v. Edeler et al., 110 F.2d 858, 27 C.C.P.A., Patents, 1091. For the reasons hereinbefore set out, we hold that the Board of Appeals did not err in affirming the refusal of the Examiner of Interferences to consider any testimony of appellants prior to October, 1929, the time when the joint activities of appellants began. The question of priority must be determined from the beginning of the joint activities of appellants.

■ One of the contentions of appellants (covered by their fifth reason of appeal to this court) is that prior invention of the subject matter in issue by Perkins precludes an award of priority to the party Engs and Moravec. In urging this contention appellants seemingly ignore the fact that Perkins, individually, is not a party to this interference. Perkins and Davies, as an entity, constitute one adverse party and Engs and Moravec, as an

entity, the other. The issue of priority is between the party Perkins and Davies and the party Engs and Moravec. In an interference proceeding a party (Perkins and Davies) cannot overcome the prior date of its adversary (Engs and Moravec) by proving that a third party (Perkins) was in effect the inventor. See Bayer v. Rice, 64 App.D.C. 107, 75 F.2d 238; and Raymond et al. v. Wickersham, 110 F.2d 863, 27 C.C.P.A., Patents, 1079.

The dates awarded appellees are not questioned. Therefore it is only necessary to examine the evidence of joint activities of appellants to determine if they have satisfactorily proved dates earlier than those awarded to appellees.

Appellants, in their brief, appear to base their case upon the theory which we have hereinbefore held to be untenable, namely, that the activities of appellant Perkins prior to his association with Davies should be held to enure to the benefit of the joint appellants. They make no contention, at least as to count 1, that the subject matter of the invention was conceived by anyone except the appellant Perkins in May or June, 1929, four or five months prior to the time the appellants became associated in their research work. They contend that appellant Perkins also reduced to practice the invention defined in count 1 at the said time of alleged conception. They further contend that the process conducted by appellant Perkins in May or June, 1929, if applied to a hydrocarbon mixture containing butylenes, would completely meet count 2, and that therefore the reduction to practice of the process of count 1 was inherently a conception of invention of the process defined in count 2. They also claim reduction to practice as defined by the process of both counts in November and also December, 1929, and throughout February, March, April, May and June, 1930, as well as constructive reduction to practice by filing their application in April, 1931.

It seems to us, from a careful review of the record of appellants, that, as was held by the examiner, no experiments had been performed by the joint appellants earlier than November 8, 1929, on the absorption of isobutylene in the *liquid phase*. In this connection the examiner stated:

"Moreover at this time there was no attempt to treat the sulfuric acid-olefine material to produce polymers of isobuty-

lene. At this stage of their work Perkins and Davies appear to have been interested only in formation of tertiary butyl and secondary butyl alcohols and the sulfuric acid-butylene material was subjected to treatment designed to effect such purpose. Any polymerized substances formed they considered as undesirable side reaction products which they sought to avoid or prevent by various expedients, and apparently little or no effort was made to determine the composition thereof. (Carruthers, Q. 28).

"Apparently, from the testimony of Davies and Perkins, Runs 13A and B, 14A and B, and 15 were the first experiments in which the temperature and pressure were maintained so as to keep the butane-butylene material in the liquid phase during the sulfuric acid treatments. In all these experiments, however, the purpose was to form alcohols; oil formation, which appears to be a polymerization of unidentified constituents of the mixture, was only a "trace" in Run 13A (preferential absorption of isobutylene in 65.1% $H_2SO_4$), while in Run 15 the 79.3% $H_2SO_4$ absorbed the secondary and tertiary butylenes, with the formation of 1930 grams of oil. Obviously neither of these Runs was the process of the counts. Run 14A was made with 68.5% $H_2SO_4$ which may or may not preferentially absorb the tertiary butylene (isobutylene). In this experiment tertiary butyl alcohol was the objective, and 436 grams of this alcohol was formed, along with 52 grams of oils, which were not identified, either as to composition or source.

"Evidence of this character manifestly is too indefinite and uncertain to establish even a conception of the invention of the counts."

In awarding the latter part of November, 1929, to appellants for conception of the involved invention, the examiner considered a report made by appellant Perkins dated November 27, 1929, together with the testimony of witnesses concerning the same. With respect to this report said appellant testified that "The report discusses the amounts of 4-carbon olefines and diolefines available at our plant and how they could be utilized." He further testified as follows:

"Q. 134. To what methods for their utilization do you refer? A. To the methods which Davies and I had been studying; that is, to the use of sulfur

dioxide for removing the butadiene and the use of different strengths of sulfuric acid for removing the butylenes. The alkyl sulfates so produced were to be made into secondary butyl alcohol and diisobutylene or tertiary butyl alcohol.

"Q. 135. On what were the descriptions of the methods contained in the report based? A. On the laboratory work of Davies and myself.

"Q. 136. What stage in the investigation of the process you have referred to is reported by the preparation of such a report? A. The laboratory work had advanced to a stage in which we knew from a chemical standpoint what could be done. This report was a preliminary attempt at an economic survey based on the chemical knowledge."

It will be noted from the last answer that on the date of the report the invention had not been reduced to practice by appellants.

In our opinion, on the record here, no. more specific date for conception of the invention could have been found than that awarded by the examiner.

Appellants have not shown that they performed any experiments satisfying the terms of the counts prior to December 3, 1929. Since this is subsequent to the date for reduction of the invention to practice awarded to appellees it is not necessary to comment upon the evidence concerning the experiment begun on that date. The examiner awarded a date not earlier than December 13, 1929, for reduction to practice by appellants, upon the basis of a weekly report of the appellant Perkins, dated December 13, 1929, in which the experiment of December 3, 1929, was described. The examiner pointed out that the actual date of the experiment was not sufficiently corroborated, stating:

"While the testimony of Curme, Holden and Carruthers might be considered as corroborative of the testimony of the joint applicants, Perkins and Davies as to successful laboratory operation of the process of the counts, these witnesses singly or collectively do not testify as to sufficient facts upon which any date whatever may be ascribed to such inventive act. In view of the general nature of their testimony, and the other circumstances of the case, such a reduction to practice might well have occurred at any time later than December 13, 1929.

"In any event, such date would be subsequent to that which the joint patentees Engs and Moravec have established for their reduction to practice, and accordingly would not entitle Perkins and Davies to priority."

We agree with the conclusions of the examiner in awarding a date not earlier than December 13, 1929, for appellants' reduction to practice.

We cannot find that any different standard has been applied to evidence of the parties, and agree with the statement of the board, heretofore mentioned, in this respect.

Prior to the printing of the record herein, appellees filed before this court a petition for certiorari to correct diminution of the record. The writ issued and accordingly there was added to the record the motion to dissolve the interference, previously mentioned, and the holdings thereon by the Primary Examiner and the Board of Appeals.

Appellees could have, but did not, raise the question of the right of appellants to make the counts before the Board of Appeals. Since this question was neither presented to nor passed upon by that tribunal it is not before us. Therefore the cost of printing the matter added to the record pursuant to the writ should be taxed against appellees.

Appellees also moved to strike two papers from the record and to dismiss certain reasons of appeal. The motion was denied by us without prejudice. The motion to dismiss is renewed in appellees' brief. Said motion is denied. Noxon v. Potts, 102 F.2d 836, 26 C.C.P.A., Patents, 1031.

For the reasons herein set out the decision of the Board of Appeals is affirmed, and the cost of printing the matter added to the record pursuant to the aforementioned writ of certiorari is taxed against appellees.

Affirmed.